UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BETH COFFED,

                     Plaintiff,                No. 07-CV-6114 CJS

    -vs-

                                        DECISION AND ORDER

XEROX CORPORATION,

                     Defendant.
_____

APPEARANCES

For Plaintiff:                Christina A. Agola, Esq.
                            2100 First Federal Plaza
                            Rochester, New York 14614

For Defendant:             Margaret A. Clemens, Esq.
                            Trent M. Sutton, Esq.
                            Nixon Peabody LLP
                            1100 Clinton Square
                            Rochester, New York 14604

INTRODUCTION

This is an action alleging employment discrimination and retaliation pursuant to

Title VII of the Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et*

*seq.*, the New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.*, and the

Equal Pay Act ("EPA"), 29 U.S.C. § 206(d).  Now before the Court is Defendants' motion

for summary judgment. (Docket No. [#16]).   For the reasons that follow, Defendant's

application is granted and this action is dismissed.

BACKGROUND

In 1997, Plaintiff began working for Defendant as an Intercompany Accounting

1

Manager, a pay-grade level 10 position with an annual salary of approximately $55,000. (Coffed Aff. ¶ ¶ 10-11). In December 1998 Plaintiff was promoted to pay grade 11. *Id*. at ¶ 17. In December 1999 Plaintiff left work for two months on maternity leave. *Id*. at ¶ 13. Upon returning to work, Plaintiff was placed in the Consolidations Group, which was a lateral move from the Intercompany Accounting Manager's position. *Id*. at ¶ ¶ 14, 16. After working in the Consolidations Group for a time, Plaintiff approached her supervisor and stated that she was "not being fully utilized." *Id*. at ¶ 19. As a result, Plaintiff was given the title Acting Consolidation Manager, and she assumed duties that were previously performed by a male, Chris Ott ("Ott"), who was a "Band B manager." *Id*. According to Plaintiff, "Band B managers are bonus level managers who have a different pay scale, become eligible for stock options and other such bonuses including week long vacations and have an actual office. It is [sic] generally starts after grade level 12." *Id*. at ¶ 20. Plaintiff states, though, that promotion to B Band was "not automatic" and was, instead, "very selective." (Coffed Dep. At 16). In any event, after Plaintiff assumed Ott's duties, she was not promoted to Band B, and remained at pay grade 11.

In November 2000, Plaintiff told her supervisor that she deserved a promotion to pay grade 12. Plaintiff's supervisor responded that he wanted to wait, because he was working on giving Plaintiff a "double promotion," meaning that she would both be promoted to pay grade 12 and made a "B Band." (Coffed Aff. at ¶ 22).[1] The supervisor indicated that Plaintiff was "on a B Band ready list," and that "when a position came up that [she] was qualified for, [she] would be approached for that particular position." *Id*. at

---

[1] In her papers, Plaintiff uses the terms "Band B" and "B Band" interchangeably.

¶ 24. At that time, Plaintiff was not aware of any B Band positions that "suited [her] background." *Id*. at ¶ 27.

In January 2001, Defendant cut various positions, including those of thirteen B Band managers. (Coffed Aff. at ¶ 23). Nevertheless, Plaintiff was promoted to pay grade twelve, and remained in her same position. *Id*. at ¶ 23. Additionally, Plaintiff's supervisor told her that she would be notified if B Band position for which she was qualified became available. *Id*. at ¶ ¶ 24-25.

Sometime in 2002, Plaintiff sought a transfer to another position, to "gain more varied experience." *Id*. at ¶ 30. Consequently, Plaintiff became a Senior Accountant. *Id*. at ¶ 34. In April 2002, Plaintiff asked that she be allowed to work part-time, thirty-two hours per week, so that she could "maintain a good work/life balance with [her] two small children." *Id*. at ¶ 36. Defendant granted Plaintiff's request to reduce her schedule to thirty-two hours per week. Later in 2002, Defendant cut additional jobs, and Plaintiff was given the duties of a woman whose employment was terminated. *Id*. at ¶ ¶ 37-38. In that regard, Plaintiff kept the same job title, assumed the duties of the terminated employee, and kept two of the three duties that she had previously performed. *Id*. at ¶ ¶ 38-39. According to Plaintiff, this resulted in her having a full-time volume of work, even though she was working part time. (Coffed Aff. at ¶ ¶ 37-39; *see also*, Coffed Dep. at 31).

Plaintiff "struggled" to complete the volume of work, and ended up working additional hours. (Coffed Dep. at 41). Despite struggling, Plaintiff continued to receive praise for her work. (Coffed Aff. at ¶ 42). In fact, Plaintiff received "excellent performance appraisals" during that period. (Coffed Dep. At 32). Plaintiff told her

supervisor that she was struggling to complete the volume of work, and he responded that he was not surprised, since the employee whose responsibilities Plaintiff had assumed had been "working 50 hours a week to get the job done." (Coffed Aff. at ¶ 43). The supervisor further stated that "everyone was struggling." *Id*. at ¶ 44.  Plaintiff, though, doubts that others were working as hard as her, since she "never witnessed anyone staying late or taking work home." *Id*. at ¶ 44.[2]  Plaintiff also believes that she was being discriminated against because of her gender, because "no other men were working part-time and no men were expected to work at a lower salary level- my salary was not a full-time salary but rather a part-time salary level and I was expected to do the same work as my male counterparts who were being paid full time." *Id*. at ¶ 49.  Plaintiff, though, does not identify the males who were supposedly being paid more for the same work.

Eventually, Plaintiff went to her immediate supervisor, Cathy Nadeau ("Nadeau"), and asked if she could be moved to a less-demanding part-time position. (Coffed Aff. at ¶ ¶ 46-48).  Nadeau spoke with her supervisor, Shirley Lian ("Lian"), and then reported back to Plaintiff that, "Shirley does not think that it's good for you to move at this point. She doesn't think its going to look good for you as a part-timer to raise your hand and say that you're overwhelmed with our workload and this could mean a black mark by your name." *Id*. at ¶ 48.  Plaintiff disagreed with Lian's purported response, but took no further action. (Coffed Dep. At 35).   According to Nadeau, she attempted to reduce

---

[2]A plaintiff may demonstrate an adverse employment action by evidence that she was assigned a heavier workload than employees outside of the protected class. *Feingold v. New York*, 366 F.3d 138, 152-153 (2d Cir. 2004).   However, mere conclusory allegations of a disproportionately heavy workload are insufficient.  *Martires v. Connecticut Dept. of Transp.*, 596 F.Supp.2d 425, 438 (D.Conn. 2009).

Plaintiff's workload, but was limited by staffing cuts: "At the time, I had an open supervisor position which limited my ability to alleviate plaintiff's workload because the other team members were already working to cover the open position.  As much as I could, I routed new ad hoc requests and job responsibilities to other employees." (Nadeau Aff. ¶ 4).  Plaintiff continued to work in the same position until April 2004, when she decided to voluntarily terminate her employment with Xerox.  However, Nadeau, with Lian's approval, counseled Plaintiff to instead take a one-year leave of absence, which Plaintiff did. (Coffed Aff. at ¶ ¶ 57-58; Nadeau Aff. ¶ 5).[3]

In or about January 2005, while still on leave of absence, Plaintiff began planning to return to work earlier than anticipated, because her husband had lost his job.  In that regard, Plaintiff began looking for a new position within Xerox, since her previous position no longer existed.  Plaintiff was hired for the position of Post-Sale Revenue Accountant, at the same level 12 pay grade as before her leave of absence. (Coffed Aff. at ¶ 63).  The individual who hired Plaintiff was Tim Fogal ("Fogal"), Director of Xerox's North American Finance ("NAF") division. (Coffed Dep. at 131).[4]  At the time Fogal hired Plaintiff, she was pregnant and did not want to return to work until six weeks after giving birth.  Defendant kept the position available for her, so that she could return to work after giving birth. *Id*. at 49.

_____

[3]Plaintiff remained on unpaid leave of absence from April 2004 through March 2005.  Although Plaintiff was on a leave of absence, she maintains, as part of this lawsuit, that she should receive her salary for that period: "Q. Any other economic loss, even though you haven't calculated the actual amount?  A. Yes. The year of absence from Xerox.  Q. You think you should be paid for that year of absence?  A. Yes.  Q. Because?  A. Because Shirley Lian gave me no option in terms of maintaining a work/life balance within Xerox.  So I felt compelled to leave."  (Coffed Dep. at 154).

[4]At her deposition, Plaintiff testified that "Tim Fogal" hired her. (Coffed Dep. At 131).  Apparently realizing that this fact undercuts her claim of discriminatory animus, Plaintiff now maintains, in her counter-statement of facts, that Fogal did "not have unilateral authority to hire." (Counter-statement of Facts, ¶ 14).

Plaintiff returned to work in March 2005.  At that time, annual salary reviews were conducted during the month of March. (Coffed Dep. at 66).  In June 2005, three months after returning to work, Plaintiff asked her manager, Tim Federation ("Federation"), for a pay raise.  Federation spoke with Fogal, and reported back that a pay raise "didn't look good" at that time. (Coffed Aff. at ¶ 67).  Federation further told Plaintiff that a raise "was not in the budget." (Coffed Dep. At 71).  Plaintiff believed that she was entitled to a raise because she had worked almost a  year without receiving a raise *before* taking her leave of absence. *Id*. at 67, 72 ("[I]n general, Xerox provides pay increases to all of its high-performing and well-performing employees every year.").  In other words, if Plaintiff had worked a full year without a raise prior to taking her leave of absence, she would have been eligible for a pay increase, although such  increases were not automatic, but instead, she left to take a leave of absence after working only ten months without a raise. *Id*. at 67.  Because of that, Plaintiff believed that it was fair for her to receive a raise in June 2005, even though she had only recently returned from her leave of absence. *Id*. at 67-68; *see also*, Coffed Dep. at 166.  Although Plaintiff did not receive a pay increase in June 2005, she received one a year after she returned to work, in keeping with Defendant's normal policy. (Coffed Dep. at 165).  In fact, Plaintiff received a pay raise for every year that she worked for Defendant, except for the year in which she took the leave of absence. *Id*. at 163-164.  Nevertheless, in this action Plaintiff maintains that the denial of her June 2005 request was discriminatory, since male employees who had *not* taken leaves of absence received pay increases. (Coffed Aff. at ¶ 68).

Upon returning to work from her leave of absence, Plaintiff told Federation that she was interested in being promoted to B Band. In December 2005, Plaintiff again told Federation of her interest in B Band, and Federation advised her to meet with Fogal. (Coffed Aff. at ¶ ¶ 70-74). In February 2006, Plaintiff met with Fogal, at which time Fogal told Plaintiff that NAF's Senior Leader staff had met in December to discuss the individuals on the "B Band ready list." (Coffed Dep. at 78). Fogal, Lian, and Terry Hartman ("Hartman") were at the meeting. Fogal stated that he did not know Plaintiff very well, and that he would have to get to know her better before he could support her promotion to B Band. (Coffed Aff. at ¶ ¶ 75-78). For example, Fogal stated that he wanted to "see [Plaintiff] manage people." *Id*. at ¶ 85. Fogal also stated that Hartman, who had previously worked with Plaintiff, did not remember her very well. *Id*. Fogal further stated that Lian was "negative" about Plaintiff, although he did not know why. *Id*. At ¶ ¶ 75-79.

Upon hearing that Lian was "negative" toward her, Plaintiff became very emotionally distraught, and cried throughout the rest of the meeting, which lasted at least an hour. (Coffed Dep. At 79-99; *see also, Id*. at 81-82: "I'm sobbing uncontrollably...."). Plaintiff protested that Lian had no "business reason" to feel negatively toward her. Plaintiff told Fogal that Lian was probably negative toward her because she had complained about having to perform full-time work on a part-time schedule. *Id*. at 79 ("I said, 'I will tell you why she is negative on me. I went to her and told her I was doing a full-time job on part-time pay, and she told me 'that's going to

make you look bad, and you need to keep your mouth shut.'").[5]  In that regard, Plaintiff told Fogal how Lian had indicated that it would "look bad" for Plaintiff if she asked for a less-demanding part-time position. (Coffed Aff. at ¶ 81).  Plaintiff further told Fogal that in 2001, she had worked in an Accounting Manager's position that was later made a Band B position:

> I said, 'Tim, back in 2001, I replaced Chris Ott.  He was a male, a Band B employee.  I was given his position as a Grade 12.  Shirley [Lian] wanted me to take the Accounting Manager job' I said, 'You know, the Accounting Manager job out in Manufacturing.  I was offered that job as a Grade 12. That job is now a Band B."

(Coffed Dep. at 80).  Throughout this conversation with Fogal, Plaintiff continued "sobbing uncontrollably." *Id*. at 83.  In response to Plaintiff's comments about Lian, Fogal stated: "'I want this conversation to end.  I want it to end now.  Stop this conversation. . . . This is water under the bridge. . . . I really need to get to know you better Beth.  This is not about all of that.  This is about me and you.' *Id*. at 81-82.  Plaintiff contends, as part of this action, that Fogal's comments were intended to stifle her complaints of "discrimination." (Coffed Aff. at ¶ 84).  However, Plaintiff admits that she did not actually accuse Lian of discrimination:

> Q. Let me ask you about that.  Did you say to him, 'She's discriminating against me because of my sex?
>
> A. I said, 'She was making me work a full-time job and I was a part-time employee.'
>
> Q. But did you say to him: 'I thought she's discriminating against me because of my gender?

---

[5]Plaintiff did not actually have such a conversation directly with Lian, but instead, Plaintiff was characterizing what her supervisor had told her Lian had said.

A. I did not say that to Tim Fogal.

(Coffed Dep. at 82).

Plaintiff maintains that after leaving the meeting with Fogal, she met with Federation, and told him that she believed she was being discriminated against, by not being immediately promoted to B Band. (Coffed Aff. At ¶ 89-90).[6]  Plaintiff told Federation that Fogal "need[ed] to understand this is discrimination because I am a woman and took time off to care for my family." *Id*. at ¶ 91.  Plaintiff's reference to "taking time off" was apparently in reference to her decision to work part-time between 2002 and 2004, while under Lian's supervision.  Plaintiff contends that, following her meetings with Fogal and Federation, they "began to keep their distance from [her] and did not help [her] further develop into a B Band employee." *Id*. at ¶ 96.  Nevertheless, in August 2006, Federation gave Plaintiff a "great" performance review, which Fogal approved. (Coffed Dep. at 125; *see also*, Pl. Local Rule 56.1 Counter-Statement, ¶ 203: "Manager Federation gave Plaintiff another excellent review[.]"; Fogal Supplemental Aff. ¶ 4).

Between August 2005 and August 2006 Plaintiff claims that she was "not given enough of a workload." (Pl. Dep. At 128, 152) ("I was there 40 hours a week and I was asking for more work because I had time to do more work.  I was not given more work, although I repeatedly raised my hand and said I wanted more work.").

On April 17, 2006, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

---

[6]Federation denies that Plaintiff complained to him of discrimination. (Federation Dep. at 81).

At some point between August 2006 and November 2006, Plaintiff approached Federation about transferring to a different working group. (Coffed Aff. at ¶ ¶ 105-106). Federation told Plaintiff that she could not pursue the other position, because it would be "disruptive" to their working group, which was already understaffed. *Id*. at ¶ 102; *see also*,Coffed Dep. at 150. In that regard, Federation stated, "[p]eople can't just walk out - move out of positions when they feel like it. We have plans in place to, you know, long term organizational plans for moving people, and you just can't do it." *Id*. at ¶ 106.[7] Plaintiff states that Federation was "hostile" toward her, which made her feel "very uncomfortable." *Id*. at ¶ ¶ 107-108. Despite Federation's objections, Plaintiff went over his head and spoke to her human resources manager, who supported her move to the new position. *Id*. at ¶ 111. Federation then signed-off on the move, and Plaintiff was promoted to Tax Compliance Manager, a B Band position. *Id*. at ¶ ¶ 112-114.

On February 23, 2007, Plaintiff commenced this action. Plaintiff's Amended Complaint [#3], in its introductory paragraph, states that the action was brought "to address a continuing pattern of unlawful hostile environment based on sex in violation of Title VII and the New York State Executive Law, § 290 *et seq*., and for retaliation in violation of Pregnancy Discrimination Act (amendment to Title VII of Civil Rights Act of

---

[7]Plaintiff testified that Xerox generally wanted employees to remain in a position for two years. (Pl. Dep. At 12) ("It's a general Xerox policy to rotate people on an approximate two-year basis."). At the time of her discussion with Federation, Plaintiff had been in her position less than two years. Federation also testified: "[W]e have a, roughly, time frame where you stay in your job. If everybody was just constantly up and looking for jobs all the time, then it would be total chaos – very disruptive when someone leaves, and you have to backfill a person." Federation Dep. at 98.

1964)[8] and the New York State Executive Law, and for unlawful pay disparity based on sex in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, as amended by the Equal Pay Act, 29 U.S.C. § § 206(d)." [sic] (Amended Complaint ¶ 1). More specifically, the Amended Complaint purports to state four causes of action: 1) discrimination under the PDA [Title VII]; 2) retaliation under Title VII; 3) retaliation under the NYHRL; and 4) discrimination under the EPA.

Plaintiff's PDA (Title VII) discrimination claim alleges that, upon returning to work in 2005,[9] following her leave of absence, she was subjected to the following "adverse actions": 1) An unnamed human resources manager told Plaintiff that she would have to work full time, not part time;[10] 2) Plaintiff was "given a lateral job assignment with the same pay level, Grade level G12"; 3) Plaintiff did not receive a pay increase in June 2005; 4) Plaintiff did not receive a promotion to B Band until approximately November 2006; and 5) Fogal and Federation did not investigate her alleged complaint of discrimination by Lian. (Amended Complaint ¶ 34).

Plaintiff's retaliation claim, under Title VII and the NYHRL, alleges that after she returned to work in March 2005, she was retaliated against in the following respects: 1) she was told by an unnamed human resources manager that she would have to work

_____

[8]At points in the Amended Complaint, Plaintiff refers to the PDA and Title VII as if they are separate statutes. However, the PDA is part of title VII. *See, Scherr v. Woodland School Community Consol. Dist. No. 50*, 867 F.2d 974, 979 (7th Cir. 1988) ("As a definitional amendment, the PDA provides no substantive rule to govern pregnancy discrimination. Instead, as part of Title VII, the PDA finds force through the substantive sections of the Act, sections 703(a)(1) and (2).").

[9]Amended Complaint ¶ 34 ("Upon returning to work after the birth of her third child in March of 2005, defendant took adverse action against Plaintiff, as follows.")

[10]As will be discussed further below, although Plaintiff insinuates that Defendant discriminated against her by "forcing" her to work full-time when she returned from her leave of absence, there is no indication in the record that she requested a part-time position.

11

full-time, not part-time;[11] 2) she did not receive a pay increase in June 2006; 3) she was not promoted to B Band until approximately November 2006; 4) Fogal told her that Lian was "negative" toward her; and 5) Fogal and Federation did not investigate her alleged complaint of discrimination against Lian. (Amended Complaint ¶ ¶ 40, 47).

Plaintiff's claim under the Equal Pay Act alleges that she was paid "at a rate less than the rate at which wages to male employees in the same establishment for equal work on jobs which required equal skill, effort and responsibility, and which were performed under similar working conditions." [sic] (Amended Complaint ¶ 51).

Following the completion of discovery, Defendant filed the subject summary judgment motion. Defendant contends that Plaintiff cannot demonstrate a prima facie case of discrimination based on sex, since she never suffered any adverse employment action, and since the actions upon which she relies did not occur under circumstances suggesting discriminatory animus. Alternatively, Defendant contends that even if Plaintiff can demonstrate a prima facie case, Defendant had legitimate non-discriminatory reasons for its actions. (*See*, Affidavits of Tim Fogal, Shirley Lian, and Cathy Nadeau). For example, Defendant maintains that Plaintiff did not receive a pay increase in June 2005, because she had not worked a full year prior to the compensation evaluations that were performed in March 2005. Moreover, Defendant maintains that in 2005 and 2006, Fogal was unfamiliar with Plaintiff and wanted more time to evaluate her before recommending her for B Band. Defendant further maintains that Plaintiff cannot demonstrate a prima facie case of retaliation, since she did not

---

[11]See the preceding footnote.

suffer any adverse employment action, and since there is no causal connection between any protected activity and any alleged retaliatory action. Finally, Defendant states that Plaintiff cannot demonstrate a prima facie case of discrimination under the EPA, since she cannot demonstrate that she was treated differently than male co-workers, and alternatively, that any difference in wages was based on non-discriminatory factors.

On September 3, 2009, counsel for the parties appeared before the undersigned for oral argument. At that time, Plaintiff's counsel clarified that Plaintiff is not attempting to assert a hostile work environment claim. Plaintiff's counsel also conceded that Plaintiff cannot prevail on her EPA claim, since she cannot identify any similarly-situated male employee who was paid more than her. Consequently, Defendant's application is granted as to the EPA claim. The Court further asked Plaintiff's counsel how Fogal and Federation allegedly retaliated against Plaintiff, to which counsel responded that they attempted to prevent Plaintiff from being promoted to B Band. The Court then asked how Plaintiff suffered an adverse employment action, inasmuch as she received a promotion to B Band anyway. Plaintiff's counsel responded that the promotion was adverse to her, since she had wanted to remain in NAF, and the B Band promotion was to a position outside of NAF. Counsel admitted, though, that Plaintiff cannot identify any B Band positions within NAF for which she was passed over. In other words, Plaintiff maintains that Fogal and Federation somehow prevented her from obtaining a B Band position within NAF, even though she cannot identify any such position.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996). Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of

fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(citations and internal quotations omitted). Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Moreover, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829 (1985).

*Title VII*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006). In 1979, "Title VII was amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), to express Congress' view that

'discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.'" *Rinsler v. Sony Pictures Entertainment, Inc.*, No. 02-Civ. 4096(SAS), 2003 WL 22015434 at *5 n. 20 (S.D.N.Y. Aug. 25, 2003) (*quoting Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983)).

It is well settled that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert den*. 522 U.S. 997 (1997). Consequently, unless otherwise noted, references to Title VII herein are also intended to refer to the NYHRL.

With these general legal principles in mind, the Court will proceed to consider Plaintiff's claims. In that regard, as mentioned above, Plaintiff is not attempting to assert a hostile environment claim, and she concedes that Defendant is entitled to summary judgment on the EPA claim. Accordingly, the remaining claims are for disparate treatment discrimination under Title VII, and for retaliation under Title VII and the NYHRL.

*Disparate Treatment*

Disparate treatment discrimination claims are analyzed using the well-settled *McDonnell Douglas*[12] burden-shifting framework:

> A plaintiff establishes a prima facie case of discrimination by showing that he or she (1) is a member of a protected [group] . . . .; (2) was qualified to perform the duties required by the position; (3) was subjected to an adverse employment action; and (4) the adverse employment action occurred in circumstances that gave rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003).

***

[12]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Once the plaintiff presents a prima facie case[13], the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon the defendant's articulation of a legitimate, non-discriminatory reason, the presumption of discrimination arising from the plaintiff's prima facie showing " 'drops out of the picture,' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000), and the burden of production shifts back to the plaintiff to adduce evidence sufficient for a reasonable jury to conclude that discrimination was a reason for the employment action, *see Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000). In deciding a motion for summary judgment, the court is to examine "the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Id.* at 90 (*quoting Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). Thus, summary judgment is appropriate when the plaintiff "has presented no evidence upon which a reasonable trier of fact could base the conclusion that [discrimination] was a determinative factor" in the defendant's employment decision. *Schnabel*, 232 F.3d at 91.

*Butts v. NYC Dept. of Housing Preservation and Dev.*, No. 07-1930-cv, 307 Fed.Appx. 596, 2009 WL 190403 at *1-2 (2d Cir. Jan. 28, 2009); *see also, Terry v. Ashcroft*, 336 F.3d at 138 ("[O]nce the defendant has made a showing of a neutral reason for the complained of action, to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.") (citations and internal quotations omitted).

With regard to the third element of a plaintiff's prima facie case,

[a]n 'adverse employment action' is one which is more disruptive than a

---

[13] "A plaintiff's burden of establishing a *prima facie* case is *de minimis*. The requirement is neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 467 (citations and internal quotation marks omitted).

mere inconvenience or an alteration of job responsibilities.  Examples of
materially adverse changes include termination of employment, a demotion
evidenced by a decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material responsibilities,
or other indices unique to a particular situation.

*Terry v. Ashcroft*, 336 F.3d at 138 (citations and internal quotation marks omitted). "[T]he

finding of an adverse employment action is a heavily fact-specific, contextual

determination." *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 228 (2d Cir.

2006) (citation and internal quotation marks omitted).  In deciding whether an

employment action is sufficiently adverse,  the plaintiff's subjective beliefs are irrelevant.

*Gelin v. Paulson*, No. 05-6043-cv, 234 Fed.Appx. 5, 2007 WL 1366325 at *7 (2d Cir.

May 10, 2007) (Finding that an objectively positive performance evaluation was not an

adverse employment action, the court observed that Title VII's "provisions for judging

harm must be objective," and accordingly, the court found that the plaintiff's "subjective

belief that he was 'downgraded' [was] irrelevant.") (citations omitted); *see also*, *Williams*

*v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("[S]ubjective, personal

disappointments do not meet the objective indicia of an adverse employment action.")

(citation omitted).

As for the fourth element of the plaintiff's prima facie case, the plaintiff must show

that the adverse action occurred under circumstances giving rise to an inference of

discrimination based on his membership in the protected class.  In that regard,

the inference of discriminatory intent could be drawn in several
circumstances including, but not limited to: the employer's continuing, after
discharging the plaintiff, to seek applicants from persons of the plaintiff's
qualifications to fill that position; or the employer's criticism of the plaintiff's
performance in ethnically degrading terms; or its invidious comments about
others in the employee's protected group; or the more favorable treatment

of employees not in the protected group; or the sequence of events leading
to the plaintiff's discharge.

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 468 (citation omitted).  As for invidious

comments, "stray remarks of a decision-maker, without more, cannot prove a claim of

employment discrimination," however, "when other indicia of discrimination are properly

presented, the remarks can no longer be deemed 'stray,' and the jury has a right to

conclude that they bear a more ominous significance." *Id*. (citations and internal

quotation marks omitted).

Assuming that the plaintiff establishes a prima facie case, and that the defendant

provides a non-discriminatory reason for the employment action, at the third tier of the

*McDonnell Douglas* test, the plaintiff is required "to produce sufficient evidence to

support a rational finding that the non-discriminatory business reasons proffered by the

defendant for the challenged employment actions were false." *Abdu-Brisson v. Delta Air

Lines, Inc.*, 239 F.3d at 470.  If the plaintiff succeeds, such evidence may, or may not,

establish the additional required proof of discriminatory intent:

> The ultimate question is whether the employer intentionally discriminated,
> and proof that "the employer's proffered reason is unpersuasive, or even
> obviously contrived, does not necessarily establish that the plaintiff's
> proffered reason is correct.  In other words, it is not enough to disbelieve
> the employer; the factfinder must believe the plaintiff's explanation of
> intentional discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (*quoting Reeves v.

Sanderson Plumbing Prods. Inc.*, 120 S.Ct. 2097, 2108-09 (2000)).  In this regard, "[t]he

relevant factors . . . include the strength of the plaintiff's prima facie case, the probative

value of the proof that the employer's explanation is false, and any other evidence that

supports or undermines the employer's case." *Id*. (internal quotation marks omitted).

In the instant case, it is clear that Plaintiff cannot meet even the low threshold necessary to establish a prima facie case. In that regard, Plaintiff cannot show that she suffered an adverse employment action, or that anything occurred under circumstances giving rise to an inference of discrimination. As discussed above, Plaintiff maintains that she was subjected to the following "adverse actions": 1) An unnamed human resources manager told her that she would have to work full time, not part time, after returning from leave of absence; 2) she was "given a lateral job assignment with the same pay level, Grade level G12"; 3) she did not receive a pay increase in June 2005; 4) she did not receive a promotion to B Band until approximately November 2006; and 5) Fogal and Federation did not investigate her alleged complaint of discrimination by Lian. (Amended Complaint ¶ 34). None of these events amount to an adverse employment action. At the outset, the Court notes that there is no indication in the record that Plaintiff asked to return to work part-time in March 2005, so her suggestion that she was forced to return to work full-time is unsupported. In any event, Plaintiff had no right to return to work part-time, and she cannot show that any male was treated more favorably. Further, the fact that she was hired back at the same pay grade following a year's leave of absence is hardly an adverse employment action.

Next, it is clear that under Defendant's policies, Plaintiff was not entitled to a pay raise in June 2005. Nor has Plaintiff identified any employee, male or female, who received a pay raise under similar circumstances.

As for Plaintiff's claim that her failure to receive a B Band promotion until November 2006 was adverse, she alleges, in conclusory fashion, that certain male

employees received preferential treatment. However, the record indicates that the males whom she identifies were not similarly situated. (Defendant's Statement of Undisputed Facts ¶ ¶ 15-21; Plaintiff's Response to Rule 56 Statement of Material Facts ¶ ¶ 15-21). For example, the men had more years of experience at Xerox, and/or worked in different areas of the company. *Id*. Additionally, one of the men that Plaintiff identified was not promoted to B Band until *after* Plaintiff. *Id*. ¶ 19. Moreover, Plaintiff has failed to identify any B Band position opening during the relevant period, for which she was qualified.

Finally, Fogal's and Federation's alleged failure to investigate Plaintiff's claim of discrimination against Lian was not an adverse employment action. In the first place, Plaintiff had absolutely no basis to accuse Lian of discrimination, since all Plaintiff knew, based on hearsay, was that Lian was "negative" toward her. Furthermore, even assuming that Plaintiff complained to Fogal or Federation about Lian, she gave them no reason to believe that Lian had actually discriminated against her. To the contrary, even accepting as true Plaintiff's belief that Lian's alleged negativity was somehow connected to Plaintiff's desire to move to a less-demanding part-time job, Lian merely indicated, in the midst of job cuts and layoffs, that it was not in Plaintiff's best interests to complain about her workload. Lian also allegedly indicated that she was "negative" on Plaintiff's prospects as a Band B manager, since Plaintiff had expressed an interest in working less, not more. There is absolutely no indication that Plaintiff's gender played any role in Lian's comments, or in any of the events about which she complains. On the other hand, the record establishes that Defendant was quite accommodating to Plaintiff, to the

point of delaying her return to work in 2005 by three months, due to her pregnancy.[14]
Moreover, even if Plaintiff had established a prima facie case, Defendant has provided
legitimate non-discriminatory reasons for its actions, which Plaintiff has not challenged
with evidentiary proof in admissible form.[15]

    *Retaliation*

    Retaliation claims are also analyzed using the *McDonnell Douglas* three-tier
burden-shifting test discussed above. *Valentine v.Standard & Poors*, 50 F.Supp.2d 262,
281-82 (S.D.N.Y. 1999)(Citations and internal quotations omitted), *aff'd*, 205 F.3d 1327
(2d Cir. 2000).  To establish a prima facie case of retaliation under Title VII, "a plaintiff
must demonstrate participation in protected activity known to the defendant, an
employment action disadvantaging the person engaged in the protected activity, and a
causal connection between the protected activity and the adverse employment action."
*Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations and internal
quotations omitted).  It is clear that "[t]he term 'protected activity' refers to action taken to
protest or oppose statutorily prohibited discrimination." *Id.* at 566.  In deciding whether a
particular activity amounts to "protected activity," "the employment practices opposed by
the plaintiff need not have actually amounted to a violation of Title VII.  Rather, the
plaintiff must have had a good faith, reasonable belief that the underlying challenged
actions of the employer violated the law. *McMenemy v. City of Rochester*, 241 F.3d 279,

---

[14]During oral argument, the Court noted that Fogal had re-hired Plaintiff while she was pregnant,
which appeared to negate any suggestion that he harbored pregnancy-related animosity toward her.
Plaintiff's counsel disagreed, stating that Fogal's hiring of Plaintiff was probably the lesser of two evils from
Defendant's point of view, since Plaintiff likely would have sued Defendant if she had not been re-hired.

[15]*See*, Affidavits of Tim Fogal, Shirley Lian, and Cathy Nadeau.

283 (2d Cir. 2001).

To make a prima facie showing of an adverse employment action, the plaintiff must show that the employer's actions caused a materially adverse change in the terms and conditions of employment. In this regard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d at 207 (*quoting Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)). Moreover, "[w]hether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 209.

Here, Plaintiff cannot demonstrate a prima facie case of retaliation. In that regard, Plaintiff alleges that after she complained in February 2006 about discrimination by Lian, she suffered the following retaliatory acts: 1) she was told by an unnamed human resources manager that she would have to work full-time, not part-time; 2) she did not receive a pay increase in June 2005; 3) she was not promoted to B Band until approximately November 2006; 4) Fogal told her that Lian was "negative" toward her; and 5) Fogal and Federation did not investigate her alleged complaint of discrimination against Lian, avoided her, and did not help her to obtain promotion to B Band. (Amended Complaint ¶ ¶ 40, 47). Notably, some of these alleged "retaliatory" acts occurred before Plaintiff ever supposedly complained of discrimination. But in any event, for many of the same reasons discussed above, none of these incidents are

23

adverse employment actions within the context of a Title VII retaliation claim. Nor is there any indication that any of these actions was causally related to protected activity. Further, even assuming that Plaintiff could demonstrate a prima facie case, Defendant has provided legitimate non-discriminatory reasons for its actions, which Plaintiff has not challenged with evidentiary proof in admissible form.[16]

CONCLUSION

For the foregoing reasons, Defendants' summary judgment motion [#16] is granted, and this action is dismissed with prejudice.

SO ORDERED.

Dated: Rochester, New York
       September 14, 2009

                                        ENTER:


                                         /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge

---

[16]*See*, Affidavits of Tim Fogal, Shirley Lian, and Cathy Nadeau.